United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT
9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11    POULLOS ET AL,                        No. C 05-03690 CRB
12              Plaintiff,                   **MEMORANDUM AND ORDER**
13       v.
14    UNITED STATES OF AMERICA,
15              Defendant.
                                        /
16
17    GOSCH,
18              Plaintiff,                   No. C 05-03810 CRB
19       v.                                  **MEMORANDUM AND ORDER**
20    UNITED STATES OF AMERICA,
21              Defendant.
22                                      /
23
24            Peter Poullos and Spencer Gosch ("Plaintiffs") both were injured while riding their
25    bicycles over a set of defunct railroad tracks that run through the San Francisco Maritime
26    National Historic Park.  Gosch's accident occurred on September 18, 2002.  Poullos's took
27    place on January 5, 2003.  Both cyclists sued the United States ("Defendant"), seeking
28    compensation for their injuries.  They allege that the National Park Service caused their
      injuries by failing to maintain the tracks in a safe condition.  Now pending before the Court

are Defendant's motions for summary judgment in these consolidated cases.  For the reasons

set forth below, Defendant's motions are GRANTED in part and DENIED in part.

## BACKGROUND

San Francisco Maritime National Historical Park covers approximately thirty-five

acres along the northern edge of the San Francisco peninsula, immediately west of

Fisherman's Wharf.  Within this historical preserve is a smaller four-acre recreation area

known as Aquatic Park, which includes a maritime museum, a beach, and a marina.  Aquatic

Park was built during the 1930s in connection with the Works Progress Administration, and

Congress has designated the site a National Historic Landmark.  The federal government

acquired the four acres comprising Aquatic Park in 1978 from the city and county of San

Francisco.  Since then, the National Park Service has assumed responsibility for

administration and maintenance of the site.

One of Aquatic Park's most significant features is a paved promenade that runs

approximately one third of a mile, from east to west, along the waterfront between Hyde

Street and Van Ness Avenue.  Beyond the promenade to the north is a set of steps leading

down to a rocky beach.  The promenade itself has a uniform width of approximately fifteen

feet.  While the northern half of the promenade has a uniform surface, a set of defunct

railroad tracks ("State Belt tracks") runs along the southern half.  A Park Service document

published in 2001 describes the tracks as follows:

> The design of Aquatic Park incorporated the existing State Belt Railroad tracks
> and Municipal Pier into its circulation system.  The State Belt Railroad tracks,
> which were originally constructed in 1914 . . . , were incorporated into the beach
> promenade when they were realigned between 1925 and 1936 during development
> of the park. . . .  The tracks retain integrity and carried trains at least until 1976,
> although the flangeways have been filled with asphalt to reduce hazards to
> pedestrians and bicyclists.

See Decl. of Owen Martikan, Ex. D, at NPS00091 (hereinafter "Park Service CLI").  The

Park Service considers the State Belt tracks a "contributing structure in the landscape,"

meaning that the tracks add to the site's cultural and historical significance.  See id. at

NPS00080, NPS00091.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

Plaintiffs were injured while cycling along the promenade.  Each rider sustained his injuries when he attempted to cross the State Belt tracks while riding parallel to them along the waterfront.  At the time of their accidents, both cyclists were riding from east to west along the northern, paved side promenade; that is, they were riding with the steps to the beach on their right, and the State Belt tracks on their left.  At some point during their ride along the promenade, both cyclists attempted to cross one of the rails of the State Belt tracks in order to avoid an obstacle — in Gosch's case the obstacle was either a pedestrian or bicyclist, while in Poullos's case it was a horse-drawn carriage.

Gosch never made it across the first rail.  He testified that one or both of his wheels "got stuck on the right side of the track and [he] went over to the left."  Decl. of Katherine B. Dowling, Ex. A, at 62-63 (hereinafter "Gosch Decl.").  He stated that he suspected "that there was enough of an elevation change at the rail, and also there was some deterioration alongside the rail."  Id. at 63.  He stated that this deterioration along the side of the rail "made enough of a groove that [his] wheel could have gotten [stuck] . . . [and] couldn't get over it."  Id. at 63.  He testified that he extended his left arm as he fell, and that his arm "took all the force" of the fall.  Id. at 62.  As a result, he sustained a broken left elbow and an injury to his left shoulder.

Poullos, by contrast, negotiated the right-hand rail successfully at first.  After crossing the rail, he rode for some distance on the paved surface between the two rails of the State Belt tracks as he passed a horse-drawn carriage.  After passing the carriage, Poullos steered back to the right, and in doing so he rode his bicycle over the northern rail of the State Belt tracks again.  Id. at 38-39.  This time, "[his] tire engaged the track or a pothole next to it, and that caused [him] to lose control of the steering."  Decl. of Owen Martikan, Ex. A, at 38, 58 (hereinafter "Poullos Decl.").  Poullos was thrown from his bicycle and fell down the steps of the seawall and onto the rocks near the water below.  As a result, he sustained an injury to his spinal cord that rendered him a quadriplegic.

It is undisputed that, at the time of Plaintiffs' accidents, the Park Service was aware that the State Belt tracks *could* pose a danger to pedestrians and cyclists.  Indeed, the Park

3

United States District Court

For the Northern District of California

Service took numerous steps to alleviate the danger posed by the defunct railroad.  First, as noted above, by 2001 the Park Service had filled the "flangeways" of the tracks with asphalt specifically "to reduce hazards to pedestrians and bicyclists."  Park Service CLI at NPS00091.  Second, by 1997 the Park Service had posted warning signs at each end of the promenade.  The signs depict the figure of a bicycle and the word "CAUTION."  They also graphically represent railroad tracks crossing the roadway at an obtuse angle.  (Despite familiarity with Aquatic Park, each of the Plaintiffs has stated that he either was not aware of, or did not see, the warning signs at the ends of the promenade.  See Poullos Decl. at 43; Gosch Decl. at 70.)  Finally, at least in the years subsequent to Plaintiffs' accidents, there is evidence that the Park Service made improvements to the promenade, filling in potholes and repairing the area immediately adjacent to the State Belt tracks where the asphalt filling the flangeways had deteriorated.  See Aff. of John J. Farrell, Ex. O, at 20-24 (describing efforts to tar and fill potholes along the promenade in response to concerns about bicycle safety).

While the parties dispute the extent to which the Park Service was aware that cyclists actually were being injured as a result of the State Belt tracks,[1] the record also contains evidence suggesting that, at the time of Plaintiffs' accidents, the Park Service was aware that the tracks *continued to pose an actual danger* to cyclists along the promenade.  For example, Joshua Hart, who worked between 2000 and 2003 as a Project Coordinator at an organization called the Rails to Trails Conservatory, indicates that he "received numerous complaints . . . from bicyclists who ride along the promenade concerning the safety issue presented by the tracks embedded in the promenade itself."  Aff. of Joshua Hart ¶ 13.  Hart further states that he "was in touch and communicated with employees of the National Park Service while I was with Rails to Trails with regard to the Aquatic Park area and specifically the promenade

---

[1] According to Plaintiffs, the State Belt tracks "have a long history of accidents and an equally long history of the [Park Service's] failure to monitor those accidents or prevent them." Poullos's Opp. to Def's Mot. for Summ. J. at 2.  By contrast, Defendant asserts that the cyclists "cannot show a pattern of prior accidents in this case, of which the Park Service was or should have been aware."  Reply Supp. Def's Summ. J. Mot. at 9.  On a motion for summary judgment, however, this Court "view[s] all facts and draw[s] all reasonable inferences in favor of the nonmoving party."  Motley v. Parks, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005).  Thus, the evidence regarding the Park Service's alleged knowledge regarding accidents caused by the State Belt tracks must be viewed in the light most favorable to Poullos and Gosch.

United States District Court

For the Northern District of California

and the safety issue of bicycles in that area." Id. ¶ 11.  Hart claims that he conveyed cyclists'

complaints to the Park Service and that he had reported to the Park Service that some cyclists

had sustained injuries as a result of the State Belt tracks.

Plaintiffs have also produced evidence of specific bicycle accidents that occurred in

the vicinity of the promenade prior to Plaintiffs' crashes.  Park Service records contain an

"incident report" that documents an accident just east of the promenade in 2001 involving a

cyclist named Alicia Toobin, who "ran over the train tracks and lost control of her bicycle,"

and as a result suffered a "left collarbone injury, [and] minor scrapes and bruises."  See Aff.

of John J. Farrell, Ex. B, at 1.  Furthermore, in 2001, in a letter written in response to

complaints about reckless bicyclists in Aquatic Park, a Park Service official noted that

"during the last eighteen (18) months there were several incidents of bicyclists falling and

injuring themselves."  See Decl. of Edward M. Mastrangelo, Ex. H, at 1.  Moreover, although

they do not expressly indicate that they informed the Park Service about their accidents,

several cyclists have testified that they fell from their bicycles while trying to negotiate the

State Belt tracks, in some cases with considerable injuries.  See Aff. of John J. Farrell, Ex. G,

at 9, 15-16 (describing an accident involving Steven Krolik in "the latter part of the 90's" in

which the victim injured his elbow after his bicycle tire fell into "a gap between the railroad

tracks and the asphalt" and "caught on the railroad tracks"); id., Ex. H, at 12-15 (describing

an accident in 2001 involving Cheryl Brinkman, as well as two other accidents that

Brinkman witnessed, in which cyclists fell as they attempted to cross the State Belt tracks);

id., Ex. P, at 12-13 (describing an accident involving Milford Pastel in which the victim fell

down, hit his head, lost consciousness, and was transported to the hospital in an ambulance

after "[his] wheels got caught in the track").

Plaintiffs have also submitted evidence regarding the Park Service's efforts, or lack

thereof, to ensure the safety of cyclists on the promenade.  The superintendent of San

Francisco Maritime National Historic Park admits that at the time of Plaintiffs' accidents the

monitoring of accidents at Aquatic Park was "hit or miss."  Id., Ex. F, at 18-19.  This

superintendent also states that there was no system in place to ensure that the various entities

that responded to accidents at Aquatic Park — the San Francisco Fire Department, the Emergency Medical Service, the Park Police — would bring those accidents to the attention of the Park Service.  Similarly, the Park Service's "safety officer" testified that he had not contacted these first-responders to find out about any accident reports that might relate to incidents at Aquatic Park.  In fact, he stated that these units had "stopped sending [accident reports] to [him] for whatever reason" and that he had not followed up to obtain information about incidents at Aquatic Park because the reports were frequently "hard for [him] to decipher."  Dep. of Timothy Przygocki at 16-17.  In response to questioning about the lack of information available to the Park Service about incidents at Aquatic Park, the officer responded: "As far as I am concerned, I do not have access to those [reports] unless I request them.  I have no way of knowing that an accident happened unless I was told than an accident happened.  If I don't hear, I don't know.  And unless someone says to me that this happened, I don't know that it happened."  Id. at 17.

## DISCUSSION

Now pending are Defendant's motions for summary judgment.  Defendant contends (1) that the Court lacks jurisdiction to hear Plaintiffs' cases under the "discretionary function exception" to the Federal Tort Claims Act, and (2) that the California Recreational Use Statute immunizes the Park Service from liability.  Summary judgment is inappropriate if there is "some part of the record that demonstrates a genuine issue of material fact and, drawing all reasonable inferences in the plaintiffs' favor, . . . a reasonable jury [could] find in their favor."  Hooks v. Clark County Sch. Dist., 228 F.3d 1036, 1038 (9th Cir. 2000).


## I. Federal Tort Claims Act

The Federal Tort Claims Act waives the federal government's immunity as to torts committed by government employees in the scope of their employment.  28 U.S.C. § 1346(b).  The statute makes the government liable "in the same manner and to the same extent as a private individual under like circumstances."  Id. § 2674.

United States District Court

For the Northern District of California

This broad waiver of immunity, however, is limited by the so-called "discretionary function exception." The exception bars all claims against government officials for actions "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the government." 28 U.S.C. § 2680(a). In other words, the United States remains immune, notwithstanding the FTCA's general waiver, for all government actions involving an element of policy-making discretion, whether or not the discretion involved was abused. Id. The purpose of the discretionary function exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." United States v. S.A. Empressa de Viacao Aerea Rio Grandense (Varig), 467 U.S. 797, 813 (1984). The government bears the burden of proving that the discretionary function exception applies. Prescott v. United States, 973 F.2d 696, 701-702 (9th Cir. 1992).

The Supreme Court has established a two-part test to determine whether an action falls within the discretionary function exception. See, e.g., United States v. Gaubert, 499 U.S. 315 (1991); Berkovitz v. United States, 486 U.S. 531 (1988). The first inquiry is whether the challenged action involves an element of judgment or choice. In other words, a court must consider whether a federal defendant is free to exercise discretion with respect to a particular course of conduct or, by contrast, whether a statute, regulation, or policy prescribes a specific course of action for the employee to follow. Berkovitz, 486 U.S. at 536. Assuming that the government officials choice involves an element of judgment, the second inquiry is "whether that judgment is of the kind that the discretionary function exception was designed to shield." Gaubert, 499 U.S. at 322-23. In other words, a court must examine whether "the challenged action in the case involves the permissible exercise of policy judgment." Berkovitz, 486 U.S. at 537.

Federal courts have eschewed formulaic categories or labels to describe which governmental decisions fall within the discretionary function exception. See GATX/Airlog Co. v. United States, 286 F.3d 1168, 1174 (9th Cir. 2002) ("Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific

United States District Court

For the Northern District of California

agency action challenged.").  Despite the Ninth Circuit's emphasis on a context-specific inquiry, some general principles are discernible from the plethora of cases that have examined the discretionary function exception in the context of maintaining public parks.

Typically, the courts have acknowledged that the maintenance of public parks requires a balance between the aesthetic and cultural demands of park management and the need to keep visitors to the park out of harm's way.  How a government official chooses to strike that balance is generally protected by the discretionary function exception.  See, e.g., Soldano v. United States, 453 F.3d 1140, 1147 (2006) (holding that the discretionary function exception barred claims based on the Park Service's decision about whether to install speed limit signs); Blackburn v. United States, 100 F.3d 1426, 1434 (9th Cir. 1996) (describing the Park Service's decisions "regarding the election, placement and text of [warning] signs" as "based on considerations of visitor enjoyment, preservation of the historical features of the [site], the need to avoid a proliferation of man-made intrusions, and protection of wildlife and the general riparian environment"); Valdez v. United States, 56 F.3d 1177, 1180 (9th Cir. 1995) (holding that a challenge to the design and maintenance of a park trail was barred by the discretionary function exception because such decisions involve a choice between the competing policy considerations of minimizing safety hazards and maximizing public access to and preservation of natural resources).

Nonetheless, once the government has chosen to strike a particular balance, the courts have generally held that the government may not act deficiently in its chosen course of conduct.  See, e.g., Soldano, 453 F.3d at 1147 (holding that the discretionary function exception did not immunize a decision to set a particular speed limit on signs already installed because that decision was "essentially a matter of scientific and professional judgment," not subject to "social, economic, or political policy"); Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1028 (9th Cir. 1989) (barring that a claim for the negligent design of an irrigation system because the design was "rooted in economic policy judgments," but permitting a claim for the negligent construction of the canal because there is "no room for [a] policy judgment and decision" to build a flawed structure); ARA Leisure

United States District Court

For the Northern District of California

1    Servs. v. United States, 831 F.2d 193, 195 (9th Cir. 1987) (holding that the Park Service's

2    decision to design and construct a windy mountain road without guardrails was grounded in

3    policy, but that its failure to keep the road from deteriorating was not).

4         From these cases, the general principle emerges, at least in the context of how

5    government officials choose to maintain or design public spaces, that an official's choice

6    about what particular course of conduct to pursue is not subject to judicial scrutiny, but the

7    official's performance in living up to his chosen course of conduct is.  See Indian Towing

8    Co. v. United States, 350 U.S. 61, 69 (1955) ("The Coast Guard need not undertake the

9    lighthouse service.  But once it exercised its discretion to operate a light on Chandeleur

10   Island and engendered reliance on the guidance afforded by the light, it was obligated to use

11   due care to make certain that the light was kept in good working order . . . ."); see also

12   Whisnant v. United States, 400 F.3d 1177, 1181 (9th Cir. 2005) ("[W]e have generally held

13   that the *design* of a course of governmental action is shielded by the discretionary function

14   exception, whereas the *implementation* of that course of action is not.").

15        Here, Defendant contends that the Park Service's actions with respect to the

16   promenade are covered by the discretionary function exception.  The government asserts that

17   its maintenance of the promenade involves an element of judgment or choice about the

18   proper balance between ensuring safety on the San Francisco waterfront and maintaining

19   Aquatic Park's historical and cultural features — precisely the type of administrative

20   decision-making that Congress sought to insulate from judicial second-guessing.  First,

21   Defendant argues that the government is immune from suit with respect to the maintenance

22   of the promenade because the Park Service's decision to incorporate the State Belt tracks as

23   an element of Aquatic Park's "circulation system" involves a policy decision about how to

24   maintain the park property.  Second, Defendant argues that the government is immune from

25   suit with respect to the Park Service's decision to erect warning signs.

*A. Incorporation of the State Belt Tracks*

27        With respect to the Park Service's decision to preserve the State Belt tracks and

28   integrate them into the promenade, the Court holds that the government's actions involved an

United States District Court

For the Northern District of California

element of discretion.  Plaintiffs do not contend, nor could they, that any federal statute or regulation prescribes a mandatory course of conduct for the Park Service to follow with respect to the treatment of the State Belt tracks.  Compare Faber v. United States, 56 F.3d 1122, 1126 (9th Cir. 1995) (finding the discretionary function exception inapplicable where the Park Service had failed to adhere to safety programs created specifically to regulate the site where the plaintiff was injured), with Childers v. United States, 40 F.3d 973, 975 (9th Cir. 1994) (finding that the Park Service had the capacity to exercise discretion in designing trails and posting warning signs, notwithstanding more general provisions and policies in Park Service manuals relating to the maintenance of safe trails).  Thus, the government has satisfied the first prong of the discretionary-function test.

The next question is whether the Park Service's decision to incorporate the defunct railroad tracks into the Aquatic Park promenade was susceptible to policy analysis — that is, whether the decision requires the Park Service to evaluate competing considerations about how best to fulfill its public policy objectives.  The Court holds that its decision regarding the State Belt tracks was such a decision.  Part of the Park Service's duty is to exercise its judgment about the proper way to maintain the nation's culturally and historically significant landmarks.  See 16 U.S.C. § 1 (establishing the Park Service's duty to "promote and promulgate" national parks and monuments in order "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations"); see also 36 C.F.R. § 68.3 (setting standards about whether and how the Park Service should intervene to preserve, rehabilitate, or restore historic structures).  The record demonstrates that the Park Service's decision to retain and incorporate the State Belt tracks as part of the promenade reflect precisely these policy considerations.  See, e.g., Park Service CLI at NPS00080 (identifying certain objects in Aquatic Park, including the tracks, as "contributing structures"); see also Aff. of Joshua Hart ¶ 15 (describing the Park Service's rejoinder, in response to complaints about the safety of cyclists, about the need "to balance

United States District Court

For the Northern District of California

historical preservation desires with the issue of bicycle safety in and around the tracks").[2]

Accordingly, the decision to keep the tracks as part of the promenade is protected by the discretionary function exception.  Similarly, the decision to pave the flangeways and not "to remove, isolate, cover, guard or otherwise render [the tracks] inaccessible," Poullos Compl. ¶ 4, is also protected by the discretionary function exception, since any alterations to the tracks would change the "distinctive materials, features, spaces, and spatial relationships" of Aquatic Park and would corrupt the "physical record of [the State Belt track's] time, place, and use," 36 C.F.R. § 68.3.  Because these decisions are immune from judicial scrutiny, this Court lacks jurisdiction to entertain any theory of liability based on the Park Service's decision to maintain the tracks or incorporate them into the promenade.  See Childers, 40 F.3d at 976 (concluding that the Park Service's decision not to close certain trails was rooted in policy, and was made after balancing public safety with considerations of conservation, available resources, and public access).

Whether the Park Service has responsibly *implemented* its decision to incorporate the tracks into the promenade, however, is a different question.  As noted above, even if the Park Service's decision to pursue a specific course of conduct with respect to the State Belt tracks is immune from judicial scrutiny, its performance in implementing the plan is not.  See Kennewick, 880 F.2d at 1031-32 (finding that the allegedly negligent design of an irrigation canal was protected by the discretionary function exception, but that its faulty construction was not).  Here, Plaintiffs also allege that their injuries were due to the dangerous construction or dilapidated condition of the paved flangeways adjacent to the railroad tracks.

---

[2] Plaintiffs argue that the discretionary function exception cannot apply to the Park Service's actions regarding the State Belt tracks because the tracks themselves were not designated as historically significant at the time of the accident, noting that the tracks were not added to the National Register of Historic Places until 2004.  This argument is wrong as a matter of law — not every feature of a National Park needs to be specifically designated in the Historic Register in order for the Park Service's choices surrounding that feature to be protected under the discretionary function exception.  Indeed the Ninth Circuit has routinely applied the discretionary function exception to the Park Service's maintenance of lands that have even minimal cultural or historic value.  See, e.g., Valdez, 56 F.3d at 1180.  Moreover, Plaintiffs' argument is wrong as a matter of fact.  Contrary to Plaintiffs' assertions, the Park Service actually published materials indicating its formal designation of the State Belt tracks as historically significant as many as two years prior to Plaintiffs' accidents.  See Park Service CLI at NPS00080 (identifying the tracks as a "contributing structure").

United States District Court

For the Northern District of California

1   Indeed, in their depositions, Plaintiffs assert that their accidents were caused either by a gap

2   next to the railroad tracks, by a change in elevation between the paved flangeways and the

3   rails, or by potholes or other deterioration in the pavement surrounding the railroad tracks.

4   See Poullos Decl. at 38 ("I turned to the right in front of the horse and buggy, and at that

5   point my front tire engaged the railroad track *or a pothole adjacent to the railroad track*,

6   which caused me to lose control of the steering . . . ." (emphasis added)); Gosch Decl. at 63

7   ("I suspect that there was enough of an elevation change at the rail, *and also there was some*

8   *deterioration alongside the rail* . . . ." (emphasis added)).  In part, at least, Plaintiffs' theory

9   is that their injuries were caused not merely by the presence of the railroad tracks, but by the

10   poor condition in which the Park Service maintained them.  As to this theory, the FTCA's

11   waiver of sovereign immunity is not excepted, and the Park Service enjoys no immunity.

12                              *B.  Installation of Warning Signs*

13        Notwithstanding Plaintiffs' citation to many such cases, this is not a case in which

14   Plaintiffs have sued based on the Park Service's failure to warn.  If it were, the governing

15   legal principles would be difficult to discern.[3]  Instead, Plaintiffs' theory is that, as with the

16   decision to incorporate the railroad tracks, once the Park Service opted to install the warning

17   signs at the ends of the promenade, the choices it made in constructing and designing them

18   _____

19        [3] To put the matter charitably, the Ninth Circuit's decisions on failures to warn are
somewhat tricky to reconcile.  Compare Soldano v. United States, 453 F.3d 1140, 1147 (9th Cir.

20   2006) (concluding that "the discretionary function exception bars the Soldanos' claim that the
Park Service negligently designed the Road without warning signs at the site of the accident);

21   Valdez v. United States, 56 F.3d 1177, 1180 (9th Cir. 1995) (holding that the failure to warn of
a dangerous precipice was not actionable because "the NPS must balance the goal of public

22   safety against competing fiscal concerns as well as the danger of an overproliferation of warning
signs"); Childers v. United States, 40 F.3d 973 (9th Cir. 1995) (holding that the decision not post

23   warning signs at a closed winter trail was protected because "Park rangers used their discretion
to balance, within the constraints of the resources available to them, a statutory mandate to

24   provide access with the goal of public safety), with  Faber v. United States, 56 F.3d 1122, 1127
(9th Cir. 1995) ("It would be wrong to apply the discretionary function exception in a case where

25   a low level government employee mad a judgment not to post a warning sign . . . ."); Sutton v.
Earles, 26 F.3d 903, 910 (9th Cir. 1994) ("A decision not to warn of a specific, known hazard

26   for which the acting agency is responsible is not the kind of broader social, economic or policy
decision that the discretionary function exception is intended to protect."); Summers v. United

27   States, 905 F.2d 1212, 1215 (9th Cir. 1990) (holding that the discretionary function exception
did not protect the Park Service's failure to warn of the danger of stepping on hot coals on a park

28   beach); Seyler v. United States, 832 F.2d 120, 123 (9th Cir. 1987) ("[W]e doubt that any
decision not to provide adequate signs would be of the nature and quality that Congress intended
to shield from tort liability.").

United States District Court

For the Northern District of California

are not immune under the discretionary function exception.  Specifically, the cyclists argue

that the signs installed by the Park Service "misleadingly suggested that the bicyclist would

encounter the railroad tracks coming at an angle to the roadway; and [they] failed completely

to warn about the gap between the railroad tracks and the roadway."  Opp. to Def's Mot. for

Summ. J. at 16.  Thus, Plaintiffs contend that because their claims involve the Park Service's

failure to make the warnings clear and relevant, and not a challenge to the Park Service's

decision about whether or not to warn, this Court has jurisdiction to entertain the claims.

(Whether Plaintiffs could prevail on such a claim, given their statements that they never

actually saw the warning signs at Aquatic Park is, of course, distinct from the jurisdictional

question now before the Court.)

    While Plaintiffs' argument has force, it fails under Ninth Circuit law.  This Court is

aware of only one case in which the Ninth Circuit has permitted a suit against the

government based on alleged flaws in warning signs erected by the government.[4]  In that

case, the Ninth Circuit permitted a claim based on the theory that warning signs in Yosemite

National Park established a dangerously high speed limit on a park road.  See Soldano, 453

F.3d at 1148-50.  Cf. Oberson v. U.S. Dep't of Agric., 441 F.3d 703, 710-12 (9th Cir. 2006)

(holding that the Forest Service's conduct was not protected where the agency increased the

speed limit of a snowmobile route without determining whether the higher speed limited was

"warranted" in light of the route's conditions).  The Soldano court emphasized that the

---

[4] The Ninth Circuit's decision in United States v. Faber, 56 F.3d 1122 (9th Cir. 1995), is not to the contrary.  In Faber, the court permitted a suit against the government brought by a plaintiff who was paralyzed after diving from a twenty-foot rock ledge into a shallow pool.  The court permitted the suit, notwithstanding the fact that the Forest Service had erected four warning signs near the top of the ledge.  Id. at 1123.  But the Faber court's holding did not rest upon the theory that the Forest Service had provided inadequate or misleading warnings, notwithstanding some dicta to the contrary.  Rather, the Faber court held that the lawsuit was permissible because the Forest Service itself had issued a "site management plan" that specifically directed the Forest Service to "provide a presence at the [accident site] to verbally warn the public, enforce the laws, and record use patterns."  Id. at 1123-24.  Thus, the decision in Faber turned not on a finding that the judgment of the Forest Service was not susceptible to policy analysis, but rather on a finding that the Forest Service's own management plan had deprived the Forest Service of any exercise of judgment at all.  Id. at 1126 ("The Forest Service had no choice but to follow the June, 1986 management plan . . . [which] listed three specific and mandatory measures that the Forest Service was to take in order to increase safety at the Falls. . . . Because the challenged conduct of the Forest Service was in direct contravention of a specifically prescribed federal policy, the discretionary function exception does not apply.").

United States District Court

For the Northern District of California

1    plaintiff's suit against the government was permissible on this basis because the setting of a

2    speed limit is "essentially a matter of scientific and professional judgment." Soldano, 453

3    F.3d at 1148. In other words, the decision to set a speed limit was "circumscribed by

4    objective safety criteria," including "such empirical factors as the elevation and stopping-

5    sight distance of a road." Id. at 1147-48. It is worth noting that the Ninth Circuit's decision

6    in Soldano actually *rejected* plaintiff's claims based on the negligent design and placement of

7    the sign. The court held that "the placement of signs are made at the discretion of the park

8    manager, who must weigh competing ends — minimal intrusion, avoidance of unnecessary

9    proliferation of signs and the safety of visitors." Id. at 1148.

10        Here, the Court finds that the alleged flaws in the signs at Aquatic Park are susceptible

11    to the policy judgment of Park Service officials. In contrast to the scientific criteria that

12    apply to the setting of a speed limit, there are no similarly objective criteria that apply to a

13    decision about how to warn of a hazard such as the State Belt tracks. Indeed, many Ninth

14    Circuit cases state that a government official's decision about where to post warning signs

15    and how to design them *is* subject to policy analysis. These cases note that the design and

16    placement of signs involve an evaluation of competing priorities, including the need to

17    protect park-goers and the need to preserve the aesthetic and recreational integrity of public

18    spaces such as Aquatic Park. See e.g., Blackburn, 100 F.3d at 1434 ("[D]ecisions regarding

19    the election, placement *and text of the signs* were based on considerations of visitor

20    enjoyment, preservation of . . . historical features . . . the need to avoid a proliferation of

21    man-made intrusions, and [so forth] . . . ." (emphasis added)). Here, the Park Service's

22    decisions about where to place the warning signs, how large to make them, what text to place

23    on them, and how to communicate the nature of the hazard posed by the State Belt tracks all

24    involve competing policy considerations about how to balance park aesthetics with visitor

25    safety. Moreover, the text placed upon the warning sign at Aquatic Park and the graphic

26    representation of the danger posed by the State Belt tracks are not susceptible to scientific

27    judgment, but rather involve policy considerations about how to alert riders and pedestrians

28    along the promenade to the obstacles they may encounter. Accord Valdez, 56 F.3d at 1180

United States District Court

For the Northern District of California

1   ("Faced with limited resources and unlimited natural hazards, the NPS must make a public

2   policy determination of which dangers are obvious and which dangers merit the special focus

3   of a warning brochure or pamphlet."); Childers, 40 F.3d at 976 ("[D]ecisions as *to the*

4   *precise manner* in which NPS would warn the public as to trails which are left open, but

5   unmaintained in the winter, clearly fall within the discretionary function exception."

6   (emphasis in original)).  The Court concludes the challenges to the warning signs raised by

7   Plaintiffs are precisely the type of administrative and policy choices that Congress intended

8   to insulate from judicial second-guessing.  Because the Court therefore holds that the

9   discretionary function exception applies to Plaintiffs' claims about the inadequacy of the

10  warning signs at Aquatic Park, the Court lacks jurisdiction to adjudicate them.[5]

11                              *C.  Conclusion*

12      In sum, the discretionary function exception deprives this Court of jurisdiction to

13  review much of the Park Service's conduct.  It is beyond the purview of this Court to

14  examine either the Park Services decision to retain and incorporate the State Belt tracks into

15  the promenade, or its decisions about how to warn cyclists about the dangers posed by the

16  tracks.  Yet the discretionary function exception is not broad enough to immunize the Park

17

18      [5] Plaintiffs also observe that the Park Service did not use the federal Manual on Uniform
    Traffic Control Devices when designing the warning signs at Aquatic Park.  This observation
19  is immaterial because the sign manual does not mandate a specific course of action for Park
    Service officials to follow when erecting warning signs.  In fact, the manual explicitly
20  contemplates that Park Service officials will exercise their discretion to deal with particular
    hazards.  See Aff. of John J. Farrell, Ex. L, at 9A-2 ("Where particular conditions require the use
21  of a device that is not included in this Manual, the general principles in the Manual as to color,
    size, and shape should be followed wherever practical.").  Thus, in the case of a unique hazard
22  such as the State Belt tracks, the sign manual actually anticipates that the Park Service will use
    unique signs.  Because the sign manual does not direct a certain course of action, it does not take
23  the Park Service's conduct outside the scope of the discretionary function exception.

24      Moreover, even if the Court were to accept Plaintiffs' argument that the Park Service
    should have followed the designs set forth in the agency's sign manual when erecting signs at
25  Aquatic Park, that argument is irrelevant on the facts of the case.  Indeed, the argument actually
    *undermines* a finding of liability.  Plaintiffs' entire theory is that the signs erected at Aquatic
26  Park misrepresented the nature of the danger posed by the State Belt tracks.  Yet the Park
    Service's sign manual does not provide an example of any sign that would more accurately
27  portray such a hazard.  The only signs in the manual that actually warn of hazards portray either
    dangerous curves in the road or the familiar slippery-when-wet graphic.  Because the Park
28  Service could not have provided more accurate warnings if it had used the sign manual, its
    failure to use the manual cannot support Plaintiffs' theory of liability.

1   Service for all of its conduct.  Because Plaintiffs have advanced theories of liability that fall

2   outside of the discretionary function exception — specifically, the theory that the condition

3   of the area adjacent to the State Belt tracks caused Plaintiff's accidents and injuries — this

4   Court has jurisdiction to entertain Plaintiffs' tort claims insofar as they are based on that

5   theory.

6   ## II.  California Recreational Use Statute

7   Defendant next contends that California's Recreational Use Statute immunizes the

8   Park Service from liability for any injuries sustained as a result of recreational activities at

9   Aquatic Park, including Plaintiffs' use of the promenade as a bicycle path.

10  Under California law, when a landowner[6] permits others to use his property "for any

11  recreational purpose," the landowner "owes no duty of care to keep the premises safe for

12  entry or use" and has no obligation "to give any warning of hazardous conditions."  CAL.

13  CIV. CODE § 846.  The statute immunizes landowners from any liability involving the

14  recreational use of their property in all but three circumstances: (1) when the landowner

15  receives something specifically in consideration for the recreational use of his property, (2)

16  when the landowner expressly invites others to use the property for recreational use, or (3)

17  when the landowner willfully or maliciously fails to guard against a dangerous condition.  Id.

18  Here, the parties agree that Poullos and Gosch both entered Aquatic Park for a

19  recreational purpose.  See id. (defining the term "recreational use" as encompassing all types

20  of "vehicular riding").  Further, the parties agree that the Park Service received nothing in

21  consideration for Plaintiffs' use of the property.  They also agree that the Park Service did

22  not expressly invite either Poullos or Gosch to use Aquatic Park for the recreational purpose

---

24  [6] The California Supreme Court has held that the Recreational Use Statute immunizes
25  only private landowners and that "public entities" are not shielded by it.  See Delta Farms
    Reclamation Dist. No. 2028 v. Superior Court of San Joaquin County, 660 P.2d 1168, 1175 (Cal.
26  1983).  Nonetheless, the statute shields the federal government in this case because the FTCA
    provides that the federal government "shall be liable [for tort claims] . . . in the same manner and
    to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674
27  (emphasis added).  Thus, both the California Supreme Court and the Ninth Circuit have held that
    the Recreational Use Statute immunizes the federal government from liability insofar as the
28  statute's provisions would apply to private entities.  See Hubbard v. Brown, 785 P.2d 1183, 1185
    (Cal. 1990); Simpson v. United States, 652 F.2d 831, 833 (9th Cir. 1981).

of cycling.  Thus, the issue boils down to whether the Park Service "willfully or maliciously fail[ed] to guard against a dangerous condition" — that is, the hazard posed to Plaintiffs by the State Belt tracks.

Under California law, a party willfully or maliciously fails to protect another's safety when (1) the party has actual or constructive knowledge of the peril, (2) the party has actual or constructive knowledge that injury is a probable, as opposed to merely a possible, result of the peril, and (3) the party acts with conscious disregard for the possibility of avoiding the peril.  See Termini v. United States, 963 F.2d 1264, 1267 (9th Cir. 1992) (citing numerous decisions by the California Court of Appeal); Spires v. United States, 805 F.2d 832, 833 (9th Cir. 1986) (same); Rost v. United States, 803 F.2d 448, 450 (9th Cir. 1986) (same); see also Mattice v. United States, 969 F.2d 818, 821 (9th Cir. 1992).

Here, a reasonable trier of fact could find that the Park Service had actual or constructive knowledge of the peril posed by the State Belt tracks.  The Park Service itself took actions that indicate an awareness of the perilous tracks, such as paving over the "flangeways" to reduce "hazards to pedestrians and bicyclists," and installing warning signs at each end of the promenade.  Park Service CLI at NPS00091.  Furthermore, the Park Service's own "incident reports" indicate awareness of the hazard.  There is also evidence that bicycle advocates had complained to the Park Service about frequent accidents along the promenade due to cyclists' engagement with the railroad tracks.  Finally, there is testimony from several cyclists about accidents they experienced or witnessed along the promenade.  And although these witnesses do not explicitly claim that they communicated their experiences on the promenade to park officials, their testimony at least gives rise to a reasonable inference that bicycle accidents along the promenade were sufficiently common to impute knowledge to the Park Service officials responsible for maintaining the premises.  For all of these reasons, a reasonable trier of fact could find that the Park Service had knowledge that the State Belt tracks were a peril to cyclists.

For the same reasons, a reasonable trier of fact could conclude that the Park Service had knowledge that injury to cyclists was a probable, as opposed to merely possible, result of

**United States District Court**
For the Northern District of California

1  engagement with the State Belt tracks.  The United States contends that the Park Service had

2  no knowledge that injury was probable because there was "not a pattern of prior accidents in

3  this case, of which the Park Service was or should have been aware," and because "none of

4  the accidents involved serious injury."  Reply Supp. Def's Summ. J. Mot. at 9-10.  But the

5  record *does* contain evidence of a history of bicycle accidents at Aquatic Park.  It also

6  contains evidence — in the form of Park Service incident reports and a letter sent by a Park

7  Service official — that government officials at Aquatic Park were aware of several such

8  accidents.  Finally, the Park Service's own actions indicate their awareness about the

9  likelihood of injury; after all, the government paved the "flangeways" and posted warning

10  signs precisely to avoid cycling accidents on the promenade.  On this record, a reasonable

11  trier of fact could conclude that the Park Service knew that injury to cyclists was likely, as

12  opposed to merely possible.

13         It is a closer question whether a reasonable trier of fact could conclude that the Park

14  Service acted with conscious disregard for the cyclists' ability to avoid injury on the State

15  Belt tracks.  Under California law, it is not enough for Plaintiffs to show that the Park

16  Service's conduct was negligent, for negligence is insufficient to sustain liability under the

17  Recreational Use Statute.  See, e.g., Bacon v. S. Cal. Edison Co., 53 Cal. App. 4th 854, 859

18  (2d Dist. 1997).  Rather, Plaintiffs must demonstrate that the Park Service "willfully and

19  maliciously" failed to protect cyclists from the deteriorating State Belt tracks, a standard that

20  the California courts have described as "an aggravated form of negligence, differing in

21  quality rather than degree from ordinary lack of care."  New v. Consol. Rock Prods. Co., 171

22  Cal. App. 3d 681 (2d Dist. 1997).

23         On the one hand, the record demonstrates that the Park Service took affirmative steps

24  to try to protect cyclists from the State Belt tracks.  As noted above, the Park Service

25  specifically paved around and between the rails of the tracks in an effort "to reduce hazards

26  to pedestrians and bicyclists."  Park Service CLI at NPS00091.  Similarly, the Park Service

27  designed brightly colored warning signs at each end of the promenade, graphically

28  admonishing cyclists to use caution when navigating the tracks.  Finally, although the precise

United States District Court

For the Northern District of California

history of the Park Service's efforts are unclear, it is apparent that the Park Service has taken steps to maintain the paved flangeways, occasionally tarring the promenade to fill potholes and other areas where the surface had deteriorated.  See Dep. of John Muir at 21 (describing "various attempts to tar or put other material in and around the tracks" from 2003 to the present).  These actions undermine Plaintiffs' contention that the Park Service acted willfully or maliciously with respect to cyclists on the promenade.  See Mattice, 969 F.3d at 823 (holding that the Park Service had not "consciously failed to avoid the danger" where it had placed multiple warning signs on a winding road and had placed a guardrail, albeit one that proved to be inadequate, at the site of the accident); see also Hannon v. United States, 801 F. Supp. 323 (E.D. Cal. 1992) (holding that the Park Service had not acted willfully or maliciously where it posted warnings of scalding hot springs).  Under California law, it does not matter that the steps taken by the Park Service turned out to be insufficient to prevent accidents along the promenade, nor is it dispositive that the Park Service was not as vigilant as it could have been in monitoring safety hazards or collecting reports of on-premises accidents.  See Hannon, 801 F. Supp. at 328 ("The fact that defendants knew of possible dangers but did not take absolutely all possible measures to protect the public does not mean defendant[s] acted willfully and maliciously.").

On the other hand, there is evidence not only that the Park Service knew that cyclists were injuring themselves while riding on the promenade, perhaps with some regularity, but that Park Service officials took steps that actually undermined their ability to help cyclists avoid the peril.  For example, Aquatic Park's superintendent indicated that the monitoring system was "hit or miss" due to the Park System's failure to collect information on accidents that occurred on the premises.  Aff. of John J. Farrell, Ex. F, at 18-19.  Moreover, the "safety officer" at Aquatic Park took steps that affirmatively undermined the Park Service's ability to respond to the hazard — discontinuing the collection of accident reports, failing to request reports from the entities that responded to accidents, and not attempting to respond to reports that he found "hard . . . to decipher."  Dep. of Timothy Przygocki at 16-17.  Finally, although the record does not demand such an interpretation, a reasonable trier of fact could infer from

United States District Court

For the Northern District of California

1  the safety officer's testimony not merely that his performance was deficient, but also that he

2  acted with conscious disregard for information indicating that cyclists were in fact unable to

3  avoid the hazard posed by the State Belt tracks.

4       In sum, while the record does not compel the conclusion that the Park Service acted

5  with conscious disregard for the safety of cyclists,[7] the Court concludes that a reasonable

6  trier of fact could find that it did.  The Court's conclusion is bolstered by the fact that, as with

7  all issues that require a determination about a party's state of mind, the question of

8  willfulness or maliciousness is one that is best suited for the trier of fact.  See Simpson v.

9  United States, 652 F.2d 831 (9th Cir. 1981) (noting that "summary judgment should be

10  granted with caution [as to the issue of willfulness], since questions such as intent or motive

11  are presented," and reversing a grant of summary judgment where the Park Service's

12  installation of warning signs next to a walkway that eventually collapsed were arguably "so

13  feeble as to rise to the level of willfulness").  Because a reasonable trier of fact could find

14  each of the elements necessary to impose liability under the Recreational Use Statute,

15  summary judgment is unwarranted.

16

17

18       [7] Plaintiffs have moved for cross-summary judgment "on the issue of liability only."
   Defendant objected to the motion on the ground that it was not been properly presented.  The
19  Court holds that the record does not compel, as a matter of law, that the United States is liable
   to Plaintiffs for the injuries they have suffered.  While a reasonable trier of fact could conclude
20  that the Park Service acted with willful and malicious disregard for Plaintiffs' safety, a
   reasonable trier of fact could also conclude that it did not.  Therefore, Plaintiffs' motion for
21  cross-summary judgment is DENIED, and the government's objections to the motion are
   DISMISSED as moot.
22
        Defendant has also moved to strike documents submitted by Poullos and Gosch in
23  opposition to Defendant's motion for summary judgment. While Poullos and Gosch each
   designated these documents as "replies" in support of their cross-motions for summary judgment
24  on the issue of liability, Defendant characterizes them as improper "surreplies" submitted in an
   effort to "get the last word in" on the issues raised by Defendant's motions.  The Court agrees
25  that these documents contain only arguments relating to Defendant's initial motions on summary
   judgment and that Plaintiffs filed them improperly.  Accordingly, Defendant's motion to strike
26  the surreplies is GRANTED. Nonetheless, in reviewing Defendant's motion to strike the Court
   necessarily examined the content of these documents.  It is worth noting that there is nothing in
27  these improper surreplies that would have changed the Court's analysis of the motions currently
   pending — and for much the same reason that it is appropriate to strike them, i.e. because they
28  contain arguments relating only to issues already thoroughly canvassed in the papers relating to
   Defendant's motions for summary judgment.

**United States District Court**
For the Northern District of California

**CONCLUSION**

1    The discretionary function exception to the FTCA deprives this Court of jurisdiction

2  to hear Plaintiff's claims to the extent that they would impose liability on the government for

3  its decision to retain the State Belt tracks or to integrate them into the promenade at Aquatic

4  Park.  Similarly, the discretionary function exception eliminates this Court's jurisdiction to

5  adjudicate Plaintiff's claims that the government is liable due to its decisions about what it

6  displayed on the warning signs at each end of the promenade.  As to those aspects of

7  Plaintiffs' claims, Defendant's motion for summary judgment is GRANTED.  However, the

8  discretionary function exception cannot shield the government for its alleged failure to

9  maintain the area surrounding the State Belt tracks in a safe condition.  Furthermore, the

10  Court finds that a reasonable trier of fact could conclude that the Park Service "willfully or

11  maliciously fail[ed] to guard against [the] dangerous condition" posed by the State Belt

12  tracks.  CAL. CIV. CODE § 846.  Thus, the Court has jurisdiction to hear Plaintiffs' claims,

13  and Defendant's motion for summary judgment is DENIED as to those claims, insofar as the

14  claims rest on the theory that Plaintiffs' injuries were caused not by the Park Service's

15  decision to keep the State Belt tracks visible or to pave the flangeways, but by its failure to

16  maintain the paved flangeways in a safe condition for cyclists.[8]

17    The Court hereby bifurcates the Plaintiffs' trials into two phases.  During the first

18  phase, the Court will consider whether Plaintiffs have established under California's

19  Recreational Use Statute that Defendant is liable for the damages sustained by Plaintiffs as a

20  result of their accidents.  If the Court finds for Plaintiffs on the issue of liability, the Court

21  will then consider the issue of damages during a second phase.  The parties are directed to

---

[8] Defendant has moved to strike the affidavit of Dr. Thomas G. Schultz, a civil engineer who has been hired as an expert witness by Plaintiffs.  It is unclear how Dr. Schultz's expert qualifications as an engineer inform his expert opinion about whether the Park Service knew of the danger to cyclists, whether it knew that injury was a probable result of that danger, and whether it acted with conscious disregard of the welfare of cyclists on the promenade.  See Fed. R. Evid. 702 (noting that expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue").  Nonetheless, the Court makes no determination about whether Dr. Schultz's affidavit is proper.  Because the Court does not rely in any way upon Dr. Schultz's affidavit to support its conclusions, Defendant's motion to strike is DISMISSED as moot.

1    appear for a status conference on Friday, November 3, 2006, at 8:30 am, in Courtroom 19, at

2    450 Golden Gate Ave, San Francisco, California, 94102, to set a schedule for trial.

3          **IT IS SO ORDERED.**

4

5

6    Dated:  October 26, 2006                    _____
                                                 CHARLES  R. BREYER
7                                                UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California